FILED
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By Carrie Ramirez at 10:43 am, Dec 14, 2009

# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

| | |
|---|---|
| In the matter of: ) | |
| ) | Chapter 7 Case |
| STEVEN M. HIBBARD ) | |
| GINGER L. HIBBARD ) | Number <u>09-40150</u> |
| ) | |
| *Debtors* ) | |

## MEMORANDUM AND ORDER
## ON MOTION OF THE UNITED STATES TRUSTEE TO DISMISS

Debtors Ginger and Steven Hibbard filed Chapter 7 on January 23, 2009 ("Petition Date"). This case was selected for audit by the Office of the United States Trustee on February 12, 2009. <u>Audit</u>, Dckt.No. 12. The United States Trustee filed a Statement that the Presumption of Abuse Does Not Arise on April 6, 2009. <u>Statement</u>, Dckt.No. 32. The United States Trustee filed a Motion to Dismiss Pursuant to 707(b) on April 20, 2009. <u>Motion</u>, Dckt.No. 39. Debtors responded on April 30, 2009 and hearings were held on May 18, 2009, July 31, 2009, and finally on September 28, 2009 to determine whether Debtors' filing was an abuse of bankruptcy proceedings either (1) under a totality of circumstances or (2) as a bad faith filing. Finally, the United States Trustee filed a Brief in Support of Dismissal on October 16, 2009 (Dckt.No. 61), and Debtors filed a responsive brief on October 20, 2009 (Dckt.No. 62).

⊗AO 72A
(Rev. 8/82)

## FINDINGS OF FACT

Debtor Ginger Hibbard dropped out of high school and obtained her GED and eventually her paralegal degree. Testimony of Ginger Hibbard, September 28, 2009. Debtor Steven Hibbard dropped out of high school after tenth grade. Testimony of Steven Hibbard, September 28, 2009. Debtors filed this Chapter 7 hoping to escape the crushing debt they took on in support of their family-owned roofing operation and the lifestyle which it had afforded them.

Debtors cashed out their 401(k) account to start Above The Rest Roofing, Inc. ("ATR Roofing") in June of 2003. Response to Motion to Dismiss, Dckt.No. 62. Steven Hibbard was the CEO and Ginger Hibbard was the CFO. ATR Roofing provided "turn-key" roofing solutions to local home builders. Id. In 2005-2006, the Hibbards quit their regular jobs to focus exclusively on ATR Roofing, eventually forming a second corporation, Above the Rest Roofing Supply & Distributor, Inc., in 2006 ("ATR Supply"). ATR Supply sold supplies to ATR Roofing; it was run solely by Ginger Hibbard. Testimony of Ginger Hibbard, September 28, 2009. Seventy-five percent of ATR Supply's revenue came from ATR Roofing. Id.

ATR Roofing operated on a high volume / low margin model, undercutting most of its competitors and focusing on roofing many houses with a low profit margin on each house. Testimony of Steven Hibbard, September 28, 2009. ATR Roofing's turn-key operation proved to be risky; in December of 2007 the housing market crashed and it was left

with thousands of dollars of unpaid invoices for work performed. Id. By early 2008 ATR Supply was out of business and ATR Roofing primarily became a labor-only roofing company.

In March 2008, Debtors refinanced their house located at 105 Crystal Drive in Rincon, Georgia, with ditech.com, an online mortgage lender. Response, Dckt.No. 62, p. 3. Debtors owed approximately $72,000.00 on their mortgage and approximately $30,000.00 on an equity line of credit/second mortgage at the time the house was refinanced. With the approximately $192,000 received in the course of the refinancing, Debtor paid off the $102,000.00 in loan balances and transferred approximately $50,000.00 to ATR Roofing. Id.; Testimony of Ginger Hibbard, September 28, 2009.

In May and June of 2008, Debtors purchased a 1998 Harley Davidson motorcycle and a new Ford F-350 truck. Id. at 4. Between June of 2008 and June of 2009 Debtors caused $31,874.20 to be transferred from ATR Roofing to their personal account. Brief in Support of Dismissal, Dckt.No. 61, Ex. 2 (October 16, 2009). This had the effect of enhancing their personal financial picture, and apparently constituted at least a partial repayment of the funds they had advanced when they refinanced their home.

In December of 2008 Steven Hibbard began to realize that the business was insolvent and might not recover. Response, Dckt.No. 62, p. 4; Testimony of Steven Hibbard, September 28, 2009. In January of 2009 Debtors began having ATR Roofing pay

for their personal vehicles. <u>Brief in Support of Dismissal</u>, Dckt.No. 61, p. 4.

Debtors filed Chapter 7 on January 23, 2009. <u>Petition</u>, Dckt.No. 1. In the section titled "Chapter 7 Individual Debtor's Statement of Intention" Debtors indicated an intent to reaffirm the debts secured by their 2005 Ford Focus, their house located at 105 Crystal Drive in Rincon, Georgia, their house located at 102 Kelly Avenue in Rincon, Georgia, their 2008 Ford F-350 Diesel truck, their 1998 Harley Davidson Motorcycle, their 1999 27' Baha Cruiser Boat, and their 2006 Lexus GS 300. <u>Petition</u>, Dckt.No. 1, pp. 7-9.

In the Statement of Financial Affairs filed on the Petition Date, Debtors failed to disclose certain information. However, these non-disclosures are mitigated by certain facts as noted below:

(1) Debtors revealed only year 2008 income despite being required to disclose "the gross amounts received during the two years immediately preceding this calendar year" as required by Question 1. Debtors did not misstate the amount of 2007 income, they simply omitted any figures. The omission was obvious.

(2) They revealed no income from ATR Supply, which had been estimated to be as high as $400.00 per month, but for an undetermined period of time. <u>Testimony of Ginger Hibbard</u>, September 28, 2009.

(3) They revealed no income from ATR Roofing related to the payment of auto loan payments or transfers of cash from ATR Roofing. However, Debtors testified that the company from time-to-time had repaid them for sums advanced to the business – thus potentially rendering these payments as loan repayments, not income. Debtors have suggested that the payments made by ATR Roofing were in repayment of the $50,000.00 cash infusion from the refinancing of their residence. Although the timing of the payments and the amounts shown on their tax returns do not match precisely, it does appear that they treated these transactions consistently as loan repayments.

(4) They revealed no payments made "on loans, installment purchases of goods or services, and other debts to any creditor made within 90 days" of the Petition Date as required by Question 3a. No evidence was produced to show whether this answer was false.

(5) They did not disclose the March 2008 refinancing of their 105 Crystal Drive residence in question 10a, which asks for "all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case." However, it is not self-evident whether the refinancing of a home is outside the "ordinary course of business," or whether they understood that the execution of a debt deed is the type of transfer required to be revealed.

(6) They did not disclose their officer positions and ownership interests in ATR Roofing or ATR Supply – in which Debtors owned 100% and served as officers – in response to Question 18a which requires disclosure of:

> the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case.

However, ATR Roofing was shown as the source of Debtors' 2008 income, and the United States Trustee had two meetings with Debtors during which he had the opportunity to clarify their role in the company. <u>Statement of Financial Affairs</u>, Dckt. No. 1, p. 40-43.

In addition, Debtors disclosed their ownership of stock in ATR Roofing on Schedule B as amended March 20, 2009, although they did not disclose any stock ownership in ATR Supply. Debtors' counsel states that the omission was an error, and that he had at his office the original Statement of Financial Affairs that did reveal in Question 21b (only

to be answered if the debtor is a corporation) that the Hibbards were officers of an unnamed corporation. Debtors' counsel claims that there was an error in the electronic filing process and that he intended to file the version he had at his office. This version of the Statement of Financial Affairs was not submitted to the court until it was attached to Debtors' response as Exhibit F-1 on October 20, 2009. Response, Dckt.No. 62-1, p. 28. However, Debtors apparently made an effort to disclose all relevant facts, albeit ineffectively at times.

Debtors' first § 341 meeting was held on February 19, 2009. In that meeting, the United States Trustee requested that Debtors make some changes to their schedules. Notably, the Trustee only requested that the Statement of Financial Affairs be amended to show three things: Debtors' payment to counsel, properly appraised values on some jewelry items, and more detail regarding household belongings listed in Schedule B.

Debtors filed an Amended Schedule B and Statement of Financial Affairs on March 20, 2009. Amended Statement, Dckt.No. 24. In the Amended Schedule B and Statement of Financial affairs, Debtors corrected the errors requested by the United States Trustee at the February 19, 2009, meeting.

At the March 26, 2009, § 341 meeting, Debtors informed the Trustee that they had rescinded the affirmation of the 1999 27' Baha Cruiser boat. Debtors also stated that the company was turning around and that the company would continue to pay their salary, which would be used to pay for the reaffirmed debt.

By June 1, 2009, the Debtors had separated and intended to end their marriage. Response, Dckt.No. 62, p. 5. Ginger Hibbard and their son moved to the house located at 102 Kelly Avenue in Rincon, Georgia. Id. She has since resigned her position at ATR Roofing and now works as a sub-insurance agent. Id. Steven Hibbard closed down ATR Roofing on September 25, 2009, and is currently unemployed. Testimony of Steven Hibbard, September 28, 2009. On September 30, 2009, Debtors rescinded the reaffirmation agreements for the 2008 Ford F-350 and the 2006 Lexus GS 300.

## CONCLUSIONS OF LAW

Based on this evidence the United States Trustee requests the case be dismissed under § 707(b)(3). Factors for a dismissal for bad faith or under a totality of circumstances have been the subject of hundreds, if not thousands, of bankruptcy court decisions. Without generalizing to too great an extent, it is correct to say that the ultimate conclusion in these cases depends on whether a debtor passes the "smell test" after consideration of all the factors. That is, upon consideration of those factors, is a bankruptcy court left with the conviction that the debtors have either abused or not abused the bankruptcy process? In re Zick, 931 F.2d 1124, 1127-1128, 1129 (6th Cir. 1991) ("Dismissal based on lack of good faith . . . should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.") (citation omitted); Haney v. Clippard, 2007 WL 781321, *3 (W.D. Ky. 2007); In re Oot, 368 B.R. 662, 666

(Bankr. N.D. Ohio 2007).

Nevertheless, because it is important to establish a structure that is coherent and uniform and enables counsel to advise their clients, courts have labored long and hard to enumerate a non-exclusive list of factors which are to be considered. While it is sometimes necessary and often tempting to separately analyze each and every one of these factors in every case before the Court, it is not mandatory to do so.

In fact, certain general themes emerge from the more recent cases that display common traits. Those traits include (1) excessive or lavish spending, both pre and post-petition; or (2) intentional concealment of assets or misrepresentation about the debtor's financial affairs; or (3) lack of effort to seek a nonbankruptcy solution to their problems coupled with (4) continuing ability to pay creditors. *Compare* In re Ricci, 2009 WL 3381517 *13-14 (Bankr. M.D. Fla. 2009) (finding that the debtors filed in bad faith because their spending was inordinately high, they had timed the filing of the petition to occur before a significant raise, they continued to spend significant sums on non-essential items, and they lacked credible explanations for excessive credit card use and selective mortgage payments), *with* In re Reese, 402 B.R 43, 51 (Bankr. M.D. Fla. 2008) (finding that despite significant spending and inaccurate schedules, the debtor did not file in bad faith because she stopped spending once she realized bankruptcy was imminent and because she lacked the understanding and ability to properly fill out and amend the schedules.). *See also*, In re James, 414 B.R. 901, 916 (Bankr. S.D.Ga. 2008) (Davis, J.) (finding debtor's filing to be an

abuse based on factors 3 and 4 supra); In re Allen, 411 B.R. 913, 922-23 (Bankr. S.D.Ga. 2009) (Davis, J.) (listing seven nonexclusive factors for proving the filing was abusive and finding the debtor's filing to be an abuse based on factors 1 and 4 supra).

Because the United States Trustee relies on the same facts to support his request for dismissal either for bad faith or under the totality test, I will address them together.

The Debtors' schedules and statement of affairs were incorrect and in some places misleading. However, in many instances, information which would lead creditors to additional information was revealed somewhere else in the schedules – for example, the question of the Debtors' positions as corporate officers, directors, or as shareholders in another company. In some cases the omission was as obvious as the omission of 2007 income. Debtors did not misrepresent their income, they simply left that information blank. However, the purpose of a creditors' meeting under section 341 is for Debtors to be questioned under oath concerning their financial affairs and the schedules they have filed with the Court. This occurred in the Hibbards' case, and indeed the Trustee requested and received amended schedules that were intended to be corrective of those omissions which were discovered at the time of the meeting. I find that there was a lack of any intent or willfulness on the Debtors' part with respect to the other omissions – but rather errors resulted from a misunderstanding of the information sought or inadequate or sloppy record keeping and reporting, which was entirely innocent in nature.

Based on all the evidence, I find that Debtors' case should not be dismissed. First, while creditors can oppose the discharge of debtors under 11 U.S.C. § 727 if debtors, with the intent to hinder delay or defraud, have concealed property or have knowingly or fraudulently made a false oath or account, no creditor has filed an objection to discharge asserting that the Debtors acted with such intent. Although the accuracy of schedules and the comprehensiveness of disclosure can be considered by the Court under the totality of circumstances test, I conclude that that factor is not alone dispositive, especially when there is no proof of fraudulent intent or any intent to hinder, delay or defraud. *See generally* In re Williamson, 414 B.R. 886 (Bankr. S.D. Ga. 2009) (Davis, J.) (applying the bad faith analysis and converting a debtor's chapter 12 to a chapter 7 because by concealing assets, accounts, claims, and businesses, and by removing, concealing, and vandalizing collateral, the debtor abused the bankruptcy process.).

Second, Debtors lived a very comfortable lifestyle leading up to the bankruptcy – one in which their consumer spending was nearly out of control, even when their businesses were operating profitably. However, in the larger sense it is not possible to equate their lifestyle, even in the best of times, with the lavishness and extravagance of many of the very high income debtors who have failed to pass the bad faith test in other cases. *See* Ricci 2009 WL 3381517; In re Cappuccetti, 172 B.R. 37 (Bankr. E.D. Ark. 1994); In re Woodburn, 2008 WL 2777352 (Bankr. E.D. N.C. 2008).

Third, unlike the debtors in most of those decisions, by the time the Debtors'

11

case was heard by the Court, the Debtors' misfortunes, brought about by the unforeseeable and catastrophic collapse of the economy in this country and of the real estate market in particular, left them with absolutely no ability to fund repayment of any of their creditors' claims either inside a Chapter 13 case or in a non-bankruptcy setting. The Debtor/Husband has had to shut down both businesses and was unemployed at the time of the hearing. The Wife and Husband have separated and the Debtor/Wife has returned to working at a rate of pay which will barely provide for her daily expenses to support herself and her child. Thus, even if their pre-petition spending is considered lavish and excessive, that pattern did not continue to the time of trial and they have no ability to repay even if they adjusted their lifestyles. Because ability to pay is recognized as the primary, though not the sole, factor in addressing the issue before the Court, absence of ability to pay is a powerful factor in denying a motion to dismiss.

For these reasons, even if I had a different view of the improper motivation or the intent behind the inadequate disclosures and the tortuous pace with which they were corrected, I can find none of the other major considerations that courts have employed for a totality of circumstances or bad faith dismissal. The Debtors bear no resemblance to the sophisticated, savvy, slick operators who come into many bankruptcy cases and attempt to game the system. They are hard working, reasonably (but not highly) educated, and they were simply caught up in circumstances that no one could foresee. In hindsight they acted unwisely and perhaps even foolishly, but in that regard they are no different than millions of other Americans who had a good faith belief that the economic times in which we have lived for

the past decade or longer would continue indefinitely. As a result, their consumer purchases and even their initial belief that they could reaffirm and hold on to some of the trappings of their former comfortable lifestyle is not indicative of bad faith or abuse of the bankruptcy process, but is rather a testament to their optimism that the bad times would be relatively short lived. They were hit by an unforeseen calamity which destroyed what had been a profitable business, they have reduced their expenditures to the minimum subsistence level and there is no evidence of further stable income with which they could repay any debt.

For the foregoing reasons I find that the United States Trustee has failed to meet his burden of proof and that the Motion to Dismiss is denied.

## ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the United States Trustee's Motion to Dismiss is DENIED.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This 11th day of December, 2009.